IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JEROME WILLIAMS, JR.,      )
                              )
        Plaintiff,       )
                              )
     v.               )   CIV. ACTION NO. 3:09cv238-CSC
                              )
MICHAEL J. ASTRUE,      )
COMMISSIONER OF SOCIAL    )
SECURITY,              )
                              )
        Defendant.     )

## MEMORANDUM OPINION

## I. Introduction

The plaintiff, Jerome Williams, Jr., ("Williams") applied for supplemental security income benefits pursuant to Title XVI, 42 U.S.C. § 1381, *et seq.*, alleging that he was unable to work because of a disability.  The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1]  *See Chester v. Bowen*, 792 F.2d 129, 131 (11ᵗʰ Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. § 405(g) and § 1631(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to entry of final

---

[1]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

judgment by the United States Magistrate Judge.  Based on the court's review of the record

in this case and the briefs of the parties, the court concludes that the decision of the

Commissioner should be reversed and this case remanded to the Commissioner for an

award of benefits.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential

evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative
> answer to any question, other than step three, leads to a determination of "not
> disabled."

---

[2]A "physical or mental impairment" is one resulting from anatomical, physiological, or
psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory
diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Administrative Proceeding

Williams was 34 years old at the time of the hearing before the ALJ.  (R. 23.)  He is a high school graduate.  (*Id*.)  Williams' prior work experience includes working as a lumber stacker, grass farm laborer, dishwasher, core setter, poultry boner, hand packager,

---

[3]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

general laborer, road laborer, grinder I, and a power grader operator. (R. 41.)  Following the hearing, the ALJ concluded that Williams has a severe impairment of "residual effects of crush injury to his left leg and ankle." (R. 12.)  The ALJ determined that Williams is unable to perform his past relevant work, but that he retains the residual functional capacity to perform sedentary work which allows alternating sitting and standing. (R. 13)  Based on the testimony of a vocational expert, the ALJ concluded that there were a significant number of jobs existing in the national economy that Williams could perform, including work as a credit card interviewer, production inspector, and escort vehicle driver. (R. 15-16.)  Accordingly, the ALJ concluded that Williams was not disabled. (R. 16.)

### IV.  The Plaintiff's Claims

In his brief, Williams presents the following claims:

(1)     The ALJ misapplied the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 to the facts of the instant case, in that he failed to consider the Claimant's testimony or the Vocational Expert's testimony in response to cross-examination by counsel.  Thus, the ALJ's decision with regard to the application of the Medical-Vocational Guidelines to the instant case goes to the great weight of the evidence.

(2)     The ALJ was not specific in which Adult Listing was applied to the facts of the instant case.  The ALJ stated that he applied 20 CFR Part 404, Subpart P. Appendix 1 §1.00 Musculoskeletal.  However, the ALJ did not specify under which sub-part of § 1.00 Musculoskeletal the instant case was evaluated.  Ostensibly, Listing § 1.08 would be the most appropriate subsection of § 1.00 Musculoskeletal, and Claimant meets or medically equals the criteria specified in said Listing.

(Pl's Brief, Doc. No. 15, p. 1.)

**IV. Discussion**

Williams raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of Williams' specific arguments because as explained below the court concludes that the ALJ erred as a matter of law and those errors warrant remanding this case for an award of benefits.

At Step Three of the sequential evaluation, the ALJ determined as follows:

> I have assessed the claimant's residual effects of crush injury to his left leg and ankle under §1.00 Musculoskeletal, Appendix 1, but the medical evidence falls short of the criteria of the section, and no medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination. The record does not show that the claimant fractured his leg. He suffered a wound that required surgical debridement and follow-up treatment.

(R. 12-13.)

First, the court notes that §1.00 is not a specific listing. Section 1.00 contains introductory information and criteria relevant to the specific musculoskeletal listings, which are found in §§ 1.02 through 1.08. Williams asserts that he meets §1.08 of the Listing of Impairments. Section 1.08 provides:

> *Soft tissue injury (e.g., burns)* of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 1.00O.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.08 (2009).

Section 1.00M defines the phrase "under continuing surgical management" as:

[S]urgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy. . . .

20 C.F.R. Pt. 404, Subpt P., App. 1 § 1.00M (2009). Although the ALJ determined that Williams did not meet the listing because medical records do not establish that he fractured his leg, there is no requirement that a claimant suffer a bone fracture in order to meet § 1.08 of the Listing of Impairments.

More importantly, the medical records indicate that Williams' left leg injury involved an injury to the skin, muscle, and fascia of his lower left leg, and therefore, may be considered under § 1.08 as a soft tissue injury. In June 2005, Williams suffered a crush injury while operating a machine with a blade which slashed his left calf.[4] (R. 211.) On June 18, 2005, Williams was admitted to surgery trauma service at Columbus Regional Medical Center, where a surgeon performed irrigation and drainage to the left leg. (R. 211.) On June 20, 2005, a surgeon performed debridement of necrotic tissue to the skin, muscle, and fascia. (*Id*.) During an additional debridement on June 23, 2005, a surgeon noted that Williams had "extensive tissue necrosis" and applied a wound vac. (*Id*.) On

---

[4] A surgeon noted that the wound "was open from the ankle to just under the knee with significant muscle involvement." (R. 211.)

June 27, 2005, a surgeon performed additional debridement of muscle and fascia.  (*Id.*)  On June 30, 2005, Williams received a skin graft to the wound.  (R. 211-212.)  Williams was discharged from the hospital with instructions for ambulation and wound care on July 8, 2005.  (*Id.*)

Williams began suffering from infections and other medical complications shortly after his discharge from the hospital. On July 19, 2005, Dr. R. Scott Hannay, a surgeon at Surgical Associates of Columbus, conducted an examination of Williams, specifically noting that he had "some leakage of lymphatic fluid from the site as well as foot swelling" and that his "foot was warm but edematous."  (R. 235.)  In addition, Dr. Hannay assessed that Williams would "need to be fitted with a stocking in the near future and try to resolve the edema which may or may not resolve."[5]  (*Id.*)  During a follow-up visit on August 9, 2005, Dr. Hannay noted that Williams had some swelling in his ankle which was likely related to lymphatic damage.  (R. 234.)  An x-ray on August 25, 2005, indicated "massive soft tissue swelling around the ankle joint."  (R. 237.)   On August 30, 2005, Dr. Hannay determined that Williams' foot edema "still persists."  (R. 233.)  On September 27, 2005, Dr. Hannay noted that Williams' edema had greatly diminished.  (*Id.*)  On November 8, 2005, Dr. Hannay's examination indicated that Williams was wearing his compression

---

[5] The court notes that, when Williams initially began seeking treatment for medical complications, he wore his stockings on a sporadic basis.  (R. 230, 232, 307-08, 336.)  There were also times when Williams consistently wore his stockings.  (R. 231, 232, 297, 302, 303-04, 307, 309, 398.)  The medical records indicate that Williams suffered from edema, swelling, and infections on his left leg on occasion even when he consistently wore the stockings.  (R. 297-302, 303-04, 309, 336, 398.)

stocking, that he had blisters which "spontaneously rupture" and ulcers with a "good bit of exudate material," and that "this could be a continuing problem." (R. 232.) On December 6, 2005, Dr. Hannay noted that Williams' edema was minimal. (*Id.*)

On December 19, 2005, Williams was admitted into Columbus Regional Medical Center. (R. 205.) Dr. Fred Roberts noted that Williams suffered from fever, malaise, and chills, that the wound was draining, that there was minimal tenderness of the left leg, and a blister on the posterior leg with clear discharge. (R. 206.) Dr. Roberts assessed cellulitis of the leg and prescribed antibiotics and Vicodin. (R. 208.) After conducting an x-ray of Williams' leg, a radiologist assessed "a metallic foreign body posterior to the knee and medial and posterior slightly distal calf area, both of which may be infected and draining." (R. 208)

The following day, Dr. Hannay examined Williams leg, noting "some area of desquamation posteriorly" and assessed that "this may be a lymphatic problem." (R 231.) On December 28, 2005, the surgeon noted that, although Williams was wearing a stocking, he had "a good bit of edema in his leg."[6] (*Id.*) On January 24, 2006, Dr. Hannay noted that the spot on Williams' leg was healing and that Williams continued to have drainage from the site. (R. 230.) The doctor advised Williams that "this will continue to be an ongoing problem due to the lymphedema in his leg." (R. 230.)   On February 28, 2006, Dr.

---

[6] Dr. Hannay also advised Williams to be fairly religious about wearing his stockings and elevating his legs. (R. 231.)

Hannay's examination indicated Williams had "some edema in his leg." (*Id.*) On May 23, 2006, Dr. Hannay noted that, although the drainage from the graft site did not appear to be infected, Williams had significant edema to the ankle. (R. 307.)

Between January and May 2006, Williams also received treatment from Dr. J. Edwin Lyle, an orthopedic surgeon, at the Hughston Clinic. (R. 225-273.) Between January and May 2006, Dr. Lyle determined that Williams was unable to work. (R. 276, 279, 280.) On May 26, 2006 – almost one year after the accident occurred, Dr. Lyle determined that Williams could return to a medium duty job with restrictions from kneeling, squatting, and crawling. (R. 273.)

On September 26, 2006, Williams returned to Surgical Associates of Columbus for treatment. (R. 336.) Dr. Hannay's examination of Williams' leg indicated drainage from the graft site and the presence of minimal edema. (*Id.*) On October 31, 2006, Dr. Hannay noted that Williams suffered from trace pitting edema below the left knee.[7] (R. 398.) On January 30, 2007, Dr. Hannay determined that, although there were no signs of infection at the graft sight, Williams suffered from non-pitting edema on his left leg and advised that he should not return to work. (R. 304-05.) On March 13, 2007, Dr. Hannay's examination indicated non-pitting edema along the left leg. (R. 302.) On March 27, 2007, Dr. Hannay noted "2+ pitting edema below the left knee" and recommended that Williams wear a graduated compression stocking and elevate his legs. (R. 299.) On April 17, 2007, Dr.

---

[7] Williams reported that he was wearing his stocking as directed. (R. 304.)

Hannay noted that Williams continued to suffer from "2+ pitting edema" and diagnosed Williams as suffering from lymphadenopathy   (R. 297.)

On November 12, 2007, Williams was admitted into Columbus Regional Medical Center with complaints of pain and swelling of the left inguinal and upper thigh for several hours, as well as fever and general malaise.  (R. 49.)  An emergency room physician, Dr. R. Andrew Williams, assessed lymphadenopathy, acute myalgia, and fever and prescribed Bactrim OS, Motrin, and Vicodin.  (R. 50.)

On December 6, 2007, Williams returned to Surgical Associates of Columbus, complaining of intermittent clear drainage from the medial calf skin grafted area, fever and chills, chest pain, and pain in his leg muscles when walking.  (R. 502.)  Dr. Kenneth L. Goldman assessed edema and "explained to [Williams] that this may never improve [v]ery much over what presents today."  (R. 503.)  During a follow-up visit on  December 20, 2007, Dr. Goldman determined Williams suffered from edema, ordered additional elastic hose, and "explained that this may not get much better, as it appears to be related to trauma/surgery of this calf area, and subsequent localized scarring, etc."  (R. 505.)  On March 6, 2008, Williams returned to Dr. Goldman with complaints of wound swelling, fever, chills, chest pain, and pain in his leg muscles when walking.  (R. 506.)  Dr. Goldman assessed that Williams suffered from edema, prescribed Cipro to treat his left groin swelling, and advised that "this may never improve very much over what presents today." (R. 507.)

Given that Williams suffered a soft tissue injury with "surgical complications, infections, or other medical complications" including edema, infections, and swelling, this court concludes that the plaintiff was under "continuing surgical management" as defined in 1.00M directed toward the salvage or restoration of major function.  Additionally, because the medical records establish that Williams sought treatment on an ongoing basis for his steadily worsening medical complications since the date of his surgery in June 2005 and his own physicians have repeatedly advised that his condition may not improve, it is evident that "such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.08 (2009).  Thus, Williams meets § 1.08 of the Listing of Impairments.

Furthermore, the vocational expert testified that a person with Williams' limitations would be unable to perform work.  During the hearing, the following discussion occurred:

Counsel:            Mr. Tilton, if you assume a job applicant with Mr. Williams' background, job history, education level, the fact that he would likely need to elevate his leg, and the fact that his, his wound care specialist has, has stated in the records that he is periodically going to have infection and/or swelling which is going to likely involve trips to the emergency room.  Assuming someone with those requirements or limitations, let's put it that way, would that person still be able, in your opinion, to perform the job duties and be gainfully as a credit card interviewer, production inspector, or escort drive?

Vocational Expert:  No, sir.

11

(R. 44.)  The medical records indicate that Williams has suffered from repeated infections, edema, and swelling which have resulted in several visits to medical specialists and hospital emergency rooms.  Consequently, Williams would likewise be entitled to benefits based on the medical evidence and the testimony of the vocational expert. This court therefore concludes that this case should be remanded to the Commissioner for an award of benefits.

## V.  Conclusion

For the reasons as stated, this case will be reversed and remanded to the Commissioner for an award of benefits.

A separate order will be entered.

Done this 12th day of May, 2010.


            /s/Charles S. Coody
            CHARLES S. COODY
            UNITED STATES MAGISTRATE JUDGE

12